UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

RAYMOND D. SIGGINS and
SUSAN K. SIGGINS,                                      No. 13-12716 TR

    Debtors.

BENJAMIN BATES,

    Plaintiff,

v.                                                     Adv. No. 13-1074 T

RAYMOND D. SIGGINS and
SUSAN K. SIGGINS,

    Defendants.

## MEMORANDUM OPINION

Benjamin Bates ("Bates") seeks a declaration that the amounts owed by Raymond D. Siggins ("Siggins") are nondischargeable under § 523(a)(2). The Court tried the dispute on August 27 – 28, 2014. The Court will deny the requested relief but grant alternative relief.

### I.    FACTS

Bates is a very experienced professional team roper. In 2009 he contacted Siggins about buying a horse to use in team roping rodeo events. Bates travelled from his home in Sun City, California to Siggins's ranch in Hondo, New Mexico and purchased a horse named "IV," paying $11,500. Siggins signed a bill of sale stating:

> I Ray Siggins sell one ten yr old chestnut gelding to one Mr. Ben Bates of Sun City CA. This horse has a freeze brand of a IV on the left hip. This horse is paid in full by ck # 4576. This horse was sold and bought with the guarantee to be free of any vice or soundness issues. The sum of the purchase is 11,500. /s/ Ray Siggins.

Bates rode IV at Siggins's ranch before deciding to buy him. While riding and roping steers atop IV, Bates noticed that IV's front hooves seemed tender. Bates told Siggins that IV seemed "off in front."[1] Bates testified that Siggins responded that a farrier had trimmed IV's hooves too short.[2] Siggins, on the other hand, testified he did not recall saying that, although he did recall Bates mentioning something about IV being sore or tender. At the time of sale IV was being ridden in rodeos and doing well at the time, and had never been examined or treated for navicular disease[3] or other causes of lameness. Today IV is owned by a roper in Hobbs, New Mexico, and is being ridden in college rodeos.

Bates returned to California with IV on November 9, 2009. He rode IV once shortly thereafter, roping eight or nine steers. Due to travel and personal illness, Bates did not ride IV again for more than six weeks. When he next rode IV, Bates thought IV was still "off in front." Bates took IV to a veterinarian, who diagnosed IV with navicular disease.

Bates called Siggins, asking to return IV. Siggins disputed that there was anything wrong with the horse and requested that x-rays of IV's hooves be sent to his veterinarian, Dr. Wheeler.[4] Siggins refused to refund Bates's money, but instead offered to exchange IV for another horse.

---

[1] "Off in front" describes a horse that is not solidly carrying its weight on its front hooves, favoring them because of pain. An experienced rider can feel a horse's response to this pain while riding. In more serious cases, an observer can see a horse responding to hoof pain, often indicated by the horse bobbing its head when it walks.

[2] When a horse's hooves are trimmed too short, it is common for the horse to have some pain in its hooves. An experienced rider may notice that such a horse is "off in front." Horses recover from having hooves trimmed too short within about six weeks.

[3] Navicular disease is a chronic, degenerative condition affecting the navicular bone in a horse's foot, which can cause soreness and/or lameness. Siggins testified that navicular problems are common in Quarter Horses, and that "80 percent of the horses x-rayed will have signs of navicular." This is Siggins' unscientific view based on his extensive experience buying, selling, and riding Quarter Horses. It is supported by Bates's expert witness, Dr. Springstead, who testified that the modern Quarter Horse is bred to weigh 1,000 pounds and have hooves "the size of a teacup," which, in Dr. Springstead's opinion, makes them prone to navicular problems.

[4] It is unclear whether Siggins ever saw the x-rays or discussed them with Dr. Wheeler. The x-rays of IV's hooves were not presented at the final hearing.

Bates reluctantly agreed to the exchange, and Siggins sent an exchange horse (the "Bay Horse") to a rendez vous point in Buckeye, Arizona. Bates's son, Brandon Bates,[5] chose the Bay Horse for his father.

Bates contacted Siggins a few days after exchanging IV for the Bay Horse, complaining that the horse "had no withers."[6] Bates demanded to return the Bay Horse for a refund. Siggins disputed Bates's complaint about the Bay Horse but agreed to allow Bates to exchange him for another horse. Siggins did not agree to refund Bates's money.

Bates returned to Siggins's ranch later in June with the Bay Horse. Bates looked at several horses. The meeting was tense, as both men were frustrated.

Bates looked at a horse named Calvin. Calvin had pads on his hooves when Bates examined and rode him.[7] According to Bates, he asked Siggins about the pads and was told, like with IV, that Calvin's hooves had been trimmed too short. Bates alleges Siggins's statement misrepresented Calvin's condition and that Siggins knew Calvin had navicular disease at the time of the exchange. Siggins disputes that this conversation took place.

Bates rode Calvin and roped four or five steers before deciding he was suitable. After riding and examining Calvin, Bates agreed to take him in exchange for the Bay Horse. The parties signed a handwritten document which stated:

> I Ray Siggins sell one sorrel gelding branded with U on the right hip. I gaurntee [sic] this horse to be free of any defect. If for any reason Mr. Bates is not satisfied with this horse he can bring him back and trade for another one of equal or lesser value. /s/ Ray Siggins /s/ Ben Bates

---

[5] Brandon Bates is good friends with Siggins and an experienced, competitive team roper.
[6] A horse's withers are between its shoulder blades. The shape of a horse's withers affects whether a saddle will sit properly on the horse or shift when the horse changes direction quickly.
[7] Pads are pieces of plastic or metal placed between a horse's hoof and the horseshoe. Pads protect the bottom of a horse's foot and are placed on a horse for various reasons.

The exchange was acrimonious. Bates took Calvin back to California on June 16, 2010.

Around July 15, 2010, Calvin became ill and would not eat or drink. Bates took Calvin to a veterinarian, Dr. Hoge, who determined that Calvin had a tumor or abscess.

An abscess can be caused by "Strangles," a streptococcus infection that affects horses. A horse infected with Strangles is unlikely to show symptoms until 14 days after exposure. An abscess on the colon caused by Strangles would not be apparent until more than a month after the initial infection. Strangles infections are treated with antibiotics such as penicillin.

During Calvin's illness, which was severe, Bates contacted Siggins, alleging Calvin was defective. At the time, Bates believed Calvin had a tumor and would die. Bates wanted a refund. Siggins disagreed that anything was wrong with Calvin.

Bates treated Calvin successfully with penicillin and took him to New Mexico to try and return him to Siggins. When Bates arrived at Siggins's ranch on July 27, 2010, Siggins refused to let Bates unload Calvin from the trailer. Siggins continued to refuse to refund Bates's money, again offering an exchange for another horse. At the time of the visit Siggins's arena was muddy, preventing Bates from trying out any other horses. Siggins asked Bates to come back when the arena was dry to try some horses and exchange Calvin. Bates, agitated by Siggins's refusals, contacted the Lincoln County Sheriff. A deputy sheriff came out to the ranch but told Bates the dispute was a civil matter and there was nothing he could do. Bates left with Calvin.

Bates hired a lawyer, who sent a July 30, 2010 letter to Siggins demanding a refund and alleging that Calvin had an incurable tumor. When Siggins did not refund his money, Bates

brought an action in New Mexico state court to recover his purchase price and other alleged damages.[8] During the litigation Bates still claimed Calvin had a tumor.

Siggins and Bates agreed to have Calvin evaluated by the San Luis Rey Equine Hospital in California to determine whether he had a tumor. On the day of the procedure, May 27, 2011, Siggins called off the test because Bates disclosed Calvin did not have a tumor.

Calvin's abscess likely resulted from a Strangles infection. It is unclear when Calvin caught the illness. Calvin was not treated for Strangles while Siggins owned him and showed no symptoms when Bates chose him.

Bates first told Siggins about Calvin's lameness issues in June, 2011, a year after taking delivery. Bates first had Calvin's hooves evaluated by Dr. Hoge in November of 2010. Dr. Hoge did not take x-rays or diagnose Calvin with navicular disease until January 11, 2011. On May 27, 2011, Bates had Calvin's hooves evaluated by San Luis Rey Equine Hospital. Dr. Sandra Valdez evaluated Calvin for lameness, took x-rays, and determined he had navicular disease. Dr. Valdez's evaluation and the x-rays were reviewed by Dr. Norman Rantanen, an equine radiograph expert, who reached the same diagnosis as Drs. Hoge and Valdez.

Bates and Siggins settled the state court action on May 31, 2011 and a stipulated order (the "Order") was entered. The Order called for Bates to return Calvin to Siggins on June 1, 2011 and for Siggins to pay Bates $13,000. The Order required Bates to deliver Calvin "in the same condition that [Bates] had represented to [Siggins] at their meeting on May 31, 2011." The Order called for interest of 10% per month if Siggins failed to pay by July 1, 2011.

Bates returned Calvin to Siggins on June 1, 2011. Siggins's understanding of the settlement was that Bates agreed to return Calvin in the same condition he was in on June 16,

---

[8] *See Benjamin Bates v. Raymond Siggins*, D-1226-CV-201000295 filed August 31, 2010.

2010. Calvin had lost 150 pounds since leaving Siggins's ranch in 2010. His hooves were long and unshod, and he was not in good condition. As a result, Siggins thought Bates had not performed his end of the bargain, so Siggins did not owe Bates the $13,000. The presiding judge disagreed and entered a judgment against Siggins for $13,000.00, plus interest accruing after July 1, 2011 at 10% per month. Siggins's requests for reconsideration were denied. Siggins has not paid the judgment.[9]

To prepare for trial of this adversary proceeding, Bates obtained records (the "Subpoenaed Records") from Dr. Wheeler's veterinary practice, Equine Sports Medicine. Bates's subpoena requested "any and all [of Calvin's] veterinarian and hospital records, from January 1, 2008 to [March 1, 2013]." In response to Bates's request, Equine Sports Medicine sent a document titled "Patient History" and two sets of x-rays. The Patient History lists the patient name as "[Calvin(Steve)]" and includes a summary of services provided by Dr. Wheeler and hand written line-item entries of the summarized treatments. The Patient History for [Calvin(Steve)] includes one entry marked "data entry error" which refers to treatment of Siggins's wife's horse, "Hotie." The two sets of x-rays, one from 2009 and one from 2011, include various angles of a horse's hoof, but do not indicate the name of the horse being x-rayed.

The x-rays included in the Subpoenaed Records were discussed extensively at trial. Dr. Springstead, Bates's expert, testified that both sets of x-rays demonstrated evidence of navicular disease, although the problem is much more evident in the 2011 x-rays. Dr. Springstead also testified that the Subpoenaed Records showed that Siggins had a horse treated for navicular

---

[9] The judgment amount has increased dramatically from the original $13,000, due to the very high interest rate. Bates now claims he is owed more than $400,000.If interest is not compounded, the amount would be about $62,400.

-6-

disease in September of 2009. There was significant dispute as to whether Calvin was the horse Dr. Wheeler had x-rayed and treated for navicular disease in 2009.[10]

Siggins testified that the Subpoenaed Records, and specifically the 2009 x-rays, were of a horse named Steve, not Calvin. Steve is owned by Calvin Taylor ("Taylor"). Siggins regularly took Steve for veterinary treatment in exchange for services Taylor provided to Siggins. Steve has had navicular disease for years. It is unclear if the Subpoenaed Records refer to Steve, to Calvin, or partly to both.

Calvin was being ridden and placing highly in rodeos in the months before he was traded to Bates. Seth Hall ("Hall rode Calvin in rodeos from January to late May of 2010. Hall grew up with Siggins's children and worked on Siggins's ranch. Siggins loaned Calvin to Hall in the beginning of 2010 to ride in rodeos. Hall said Calvin did not have any lameness issues, Strangles, or symptoms of an abscess while in his possession. Hall kept pads on Calvin at all times to protect Calvin's feet from bruises or other hoof injuries common in an active rodeo horse.

Siggins maintains that he has always been willing to give Bates a horse that meets his needs. At trial Siggins again said he was still willing, despite his bankruptcy filing, to give Bates a horse in honor of their original transaction and agreement.

## II. DISCUSSION

A. <u>Section 523(a)(2)(A) Standards</u>. Bates's claim is brought under § 523(a)(2)(A). A creditor seeking to except its debt from a debtor's discharge under § 523(a)(2)(A) must prove, by a preponderance of the evidence that the debtor made a false representation; with the intent to deceive the creditor; the creditor relied on the representation; the reliance was reasonable; and

---

[10] There is no question the 2011 x-rays from Equine Sports Medicine are of Calvin.

-7-

the representation caused the creditor to sustain a loss. *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009) (quoting *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)).

Exceptions to discharge are "narrowly construed [such that] doubt as to the meaning and breadth of a statutory exception is to be resolved in the debtor's favor." *Cobra Well Testers, LLC v. Carlson (In re Carlson)*, 2008 WL 8677441, at *2 (10th Cir. 2008) (quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

The Tenth Circuit construes § 523(a)(2)(A) narrowly to limit the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong." *DSC National Properties, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (B.A.P. 10th Cir. 2012) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986) (abrogated on other grounds by *Grogan v. Garner*, 498 U.S. 279 (1991)). To avoid discharge based on false pretenses, false representation, or actual fraud, the creditor must prove the debtor "acted with the *subjective intent* to deceive the creditor." *Johnson*, 477 B.R. at 169.

As a creditor seeking to avoid discharge, Bates bears the burden of proving the elements of § 523(a)(2)(A). *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

B. <u>The Initial Sales Transaction</u>. Bates first argues that Siggins defrauded him when Siggins sold IV, knowing the horse had navicular disease. The only alleged fraudulent statement was that Siggins attributed IV's soreness to having his hooves trimmed too close.

To prove Siggins knew IV had navicular disease at the time of sale, Bates testified that his veterinarian diagnosed IV with navicular disease. On the other hand, IV had been ridden successfully before the sale to Bates, IV was not lame before the sale, and had never been treated

for navicular disease. None of IV's veterinary bills or records were introduced. Siggins also disputes that an x-ray showing some sign of a navicular condition necessarily means that the horse is lame or otherwise unsound. Today, IV is being ridden in rodeos today.

Based on the conflicting and sparse evidence, the Court concludes that Bates did not carry his burden of proof on the issue of Siggins's knowledge of IV's alleged lameness when Siggins sold IV to Bates.

C. <u>Exchange for the Bay Horse</u>. Bates does not allege Siggins made any misrepresentations concerning the Bay Horse.

D. <u>Calvin</u>. Siggins reluctantly agreed to trade Calvin for the Bay Horse, and Bates reluctantly agreed to take Calvin rather than get his money back. After the parties agreed in principle to the trade, they signed a short agreement, in which Siggins guaranteed that Calvin was free from any defect or vice, and that Siggins would trade Calvin for a horse of equal or lesser value if Bates was dissatisfied for any reason.

Bates argued at trial that Siggins made two misrepresentations about Calvin: Siggins hid the fact that Calvin had Strangles, and Siggins lied about Calvin's navicular disease.

    i. <u>Knowledge of Strangles</u>. Bates argued that Siggins knew Calvin had Strangles or an abscess at the time of the trade. However, it is undisputed that Calvin had no symptoms of Strangles at the time of the trade. Calvin was healthy in appearance and was being ridden competitively at the time. He was not being treated for Strangles. Bates did not prove Siggins knew Calvin had Strangles or an abscess before the sale.

    ii. <u>Knowledge of Navicular Disease</u>. Bates also argued Siggins knew Calvin had navicular disease at the time of the trade. Bates relies on veterinary records, June 2009 x-

rays, and the pads on Calvin's hooves to support his argument. Bates's expert testified that one of the 2009 x-rays demonstrated navicular disease. The Subpoenaed Records show a horse being treated with injections consistent with treatment for navicular disease. Bates's expert testified that pads may be used to counteract the symptoms of navicular disease. Siggins owned Calvin when the x-rays were taken and the records were made.

In response, Siggins presented evidence that Calvin was not the horse x-rayed in 2009 or referred to in the records. Siggins presented evidence that Taylor's horse, Steve, was the horse x-rayed and treated in 2009. Siggins also presented evidence that he had Calvin examined for navicular disease in June, 2011, which he would not have done had he known about the problem. Siggins also presented evidence that pads are used for reasons other than navicular problems. Finally, Siggins presented credible, uncontradicted evidence that Calvin was being ridden and doing well in rodeos at the time of sale, and appeared to be sound in all respects.

Based on the conflicting evidence and the fact that some type of navicular issue is common in quarter horses, the Court concludes that Bates did not carry his burden of proving that Siggins knew Calvin was unsound when he was traded for the Bay Horse in June, 2010.

E.  <u>Siggins's Post-Petition Offer to Give Bates a Horse</u>. Several times during the trial Siggins testified that it was always his intent to allow Bates to exchange horses until Bates was satisfied. Further, Siggins offered during the trial to allow Bates to select a horse of equal or lesser value at any time, bankruptcy or no. The Court relies on this testimony and offer in finding that Siggins dealt honestly with Bates and did not make any intentional misrepresentations or omissions.

-10-

The Court will enter an order giving Brandon Bates one year to select a horse for Bates, from Siggins's horses held for sale at a reasonable retail value of $15,000 or less. The horse shall be delivered "as is, where is," and "with all faults." Before making a final selection, Bates may have a horse examined by a veterinarian, at his expense. Bates may try out a horse at Siggins's ranch if Siggins agrees; otherwise Bates's son may take the horse to another site in Lincoln County, New Mexico for a trial. Once a horse has been selected by Bates's son, the transaction will be final, with no right of refund or exchange. Siggins will sign any necessary paperwork to transfer title of the horse to Bates.

### III. CONCLUSION

Siggins's pre-petition obligations to Bates are dischargeable. Siggins's post-petition obligation to Bates (i.e. providing a horse as described above) shall survive entry of the general discharge order in this case. A separate judgment shall be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered September 22, 2014.

Copies to:

Michael Daniels
P.O. Box 1640
Albuquerque, NM 87103

Ronald Holmes
112 Edith Blvd. NE
Albuquerque, NM 87102